# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| STERNE, AGEE & LEACH, INC., and | ) | |
| SIERRA EQUITY GROUP, LTD., | ) | |
| | ) | |
| **Plaintiffs** | ) | |
| v. | ) | **CV-07-BE-909-S** |
| | ) | |
| NATIONAL SECURITIES CLEARING | ) | |
| CORPORATION; et al., | ) | |
| | ) | |
| | ) | |
| **Defendants** | ) | |
| | ) | |

## MEMORANDUM OPINION

This matter is before the court on "Birch Capital, Inc. and Eddy U. Marin's Amended Motion to Dismiss for Lack of *In Personam* Jurisdiction and Improper Venue or In the Alternative Transfer of Venue" (doc. 107) as amended (doc. 130); "Defendants BHI Group, Inc., Glenwood Marketing Associates, Ltd., Frank Zangara and Therese Zangara's Amended Motion to Dismiss the Second Amendment to Verified Complaint of Sterne, Agee & Leach, Inc." (doc. 110) as amended (docs. 125[1]); "Defendants BHI Group, Inc., Glenwood Marketing Associates, Ltd., Frank Zangara and Therese Zangara's Amended Motion to Dismiss the Amended Complaint for Injunctive and Declaratory Relief of Plaintiff Sierra Equity Group, Ltd." (doc. 132); "Motion to Dismiss by Defendant Manfredonia" (doc. 134); and "Motion to Dismiss by BMF Consulting, Ltd." (doc. 138).

For the reasons stated below, the court will

---

[1]This document was originally incorrectly docketed as a Motion to Amend.

1

(1) DENY the Birch Capital Defendants' motion to dismiss (doc. 107, as amended in doc. 130);

(2) DENY the Birch Capital Defendants' alternative motion for transfer of venue under 1404(a) (doc. 107, as amended in doc. 130).;

(3) GRANT in part the motions to dismiss of the Zangara Defendants, Joseph Mandredonia, and BMF Consulting, Ltd. in this respect: Count One will be dismissed without prejudice as to all Defendants, including the Birch Capital Defendants, *only to the extent that it alleges misrepresentations and omissions under 10b-5(b)* (doc. 110, as amended in doc. 125; doc. 132, 134, 138)*;*

(4) DENY the motions to dismiss of the Zangara Defendants, Joseph Mandredonia, and BMF Consulting, Ltd. regarding Counts One through Six on all other grounds (doc. 110, as amended in doc. 125; doc. 132, 134, 138).

## I.  FACTS[2]

Plaintiff Sterne Agee & Leach, Inc. ("Sterne Agee") filed the original Complaint in this case, requesting injunctive and declaratory relief, as well as  a motion for temporary restraining order "to preserve the status quo pending investigation of criminal fraudulent activity on the securities market." (docs. 1 & 2).   Plaintiff Sierra Equity Group, Ltd. ("Sierra") subsequently successfully moved to intervene in the case.  Sterne Agee filed its latest complaint, Second Amendment to Verified Complaint (doc. 86) in October of 2007, and Sierra filed a separate

---

[2] Unless the court states otherwise, the paragraph designations refer to the complaints that Sterne-Agee filed, for ease of reference.  Sierra's complaints were virtually identical to those that Sterne-Agee filed.

Amended Complaint (doc. 92) shortly thereafter. The court granted the injunction to preclude numerous securities houses from settling pending a closer evaluation.

Plaintiffs, Sterne Agee and Sierra, allege that "Scheme Defendants"[3] conducted a fraudulent "pump and dump" scheme to fraudulently manipulate the market price for Art4Love ("ALVN") stock that resulted in fraudulent trades in ALVN on May 10, 2007.  The "Scheme Defendants" have filed the motions to dismiss currently at issue.  For ease of reference and because these "Scheme Defendants" fall into three groups, the court will address the motions by group.  The first group, the Birch Capital  Defendants, is composed of Eddie Marin and the Florida corporation that he allegedly controls, Birch Capital, Inc.  The second group, the Zangara Defendants, is composed of Frank Zangara; his wife, Therese Zangara; and two companies that they allegedly control, BHI Group, Inc;  and Glenwood Marketing Associates, Inc.  The third group, the BMF Defendants, is composed of  BMF Consulting, Ltd.; and  Joseph Manfredonia, who allegedly has authority as Secretary over the BMF brokerage account at Franklin Ross.

The  Plaintiffs assert the following facts in support of their allegations, and the court assumes their truthfulness for the purposes of these Motions to Dismiss.  *See United States v. Pemco Aeroplex, Inc.,* 195 F.3d 1234, 1236 (11th Cir. 1999) (en banc).

To begin their scheme, the Scheme Defendants transferred millions of ALVN shares among themselves in March and April of 2007:

> A.  On March 13, 2007, Frank Zangara transferred 1,950,000 shares of ALVN from BHI's account at Barron Moore (which he controlled) to BHI's account at Franklin Ross (which he controlled);

---

[3]The term "Scheme Defendants" is not a term that the court created; Defendant Sterne Agee used that term to distinguish between the Defendants who allegedly conducted the "pump and dump" scheme on one hand and on the other hand, the nominal Defendants who were unwittingly a part of the scheme.

B.  On April 4, 2007, BHI Group (controlled by the Zangara Defendants) transferred 250,000 shares of ALVN to the account of BMF (controlled by defendants Miller and Manfredonia);

C.  On April 4, 2007, Glenwood (controlled by the Zangara Defendants) transferred 3 million shares of ALVN to the account of BMF (controlled by defendants Miller and Manfredonia) pursuant to instructions from Therese Zangara; and

D.  On April 19, 2007, BMF (controlled by defendants Miller and Manfredonia) transferred 2 million shares of ALVN to Birch Capital (controlled by Defendant Marin) and entered into a "consulting agreement" for unspecified services with Birch Capital pursuant to instructions from Manfredonia.

After those transfers of ALVN stock, specifically on April 20, 2007; April 27, 2007; and on May 10, 2007, ALVN became the subject of significant spamming activity.

After the spamming activity on May 10, 2007, the Scheme Defendants invaded, or caused to be invaded, two accounts at West Park Capital, Inc.  Scheme Defendants issued a series of unauthorized and fraudulent "buy" orders from those accounts to purchase a total of $109,400 shares of ALVN.  Approximately an hour and a half after the invasion of the West Park accounts, the Scheme Defendants also invaded, or caused to be invaded, the account that the Louise E. Rehling Trust maintained with Sierra ("the Account").   Using the identification numbers and password assigned to Sierra's principal, Eric Bloom, without Bloom's permission, the Scheme Defendants entered unauthorized and fraudulent "buy" orders on behalf of the Account via the Automated Financial System ("AFS") for the purchase of approximately 2.2 million shares of ALVN.  The AFS system routed the unauthorized trades from Sierra's system to Sterne Agee's trading desk for execution. As the clearing broker for Sierra, and to fill the fraudulent buy orders that the Account initiated, Sterne Agee placed buy orders for millions of shares of ALVN.

On that single day, May 10, 2007, the ALVN trading volume spike from 21,000 shares on May 9, 2007 to more than 2.2 million shares on May 10, 2007.  That sudden increase in volume caused an artificial spike in the price of ALVN, from 17 cents to 40 cents in one day.  To complete their scheme, the Scheme Defendants began dumping their shares of ALVN on May 10,2007, selling approximately 2,100,000 of their holdings in ALVN at the artificially-inflated prices they had created through the fraudulent buy orders.

Late on May 10, 2007, Sterne Agee discovered that neither Bloom nor Ms. Rehling had issued the ALVN buy orders nor had they authorized anyone else to do so.  On May 11, 2007, Sterne Agee contacted the Alabama Securities Commission and the Securities and Exchange Commission, requesting regulatory intervention to stop the trades from settling.  On May 14, 2007, Sterne Agee also requested the National Securities Clearing Corporation's assistance in preventing the trades from settling.  When these groups did not prevent the trades from settling, Sterne Agee filed the instant action and obtained injunctive relief.  In July of 2007, Sierra filed a Motion to Intervene of 2007, and the court subsequently granted its motion.  The Amended Complaints in the instant action contain the following counts: Count One - Violation of the Securities and Exchange Act of 1934; Count Two - Request for Injunctive Relief; Count Three - Request for Declaratory Judgment; Count Four - Attorneys' Fees and Costs, Indemnity and Contribution against Defendants; Count Five - Alternative Claim for Unjust Enrichment; Count Six (Sterne Agee only) - Action in the Nature of Interpleader.

Because many of the motions raise issues of personal jurisdiction and venue, the briefs focus on facts specific to each group of Scheme Defendants, and the court will note those facts in its discussion section.

## II.  LEGAL STANDARDS

A Rule 12(b)(6) motion to dismiss attacks the legal sufficiency of the complaint. Generally, the Federal Rules of Civil Procedure require only that the complaint provide "'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957); *see also* Fed. R. Civ. P. 8(a).  A plaintiff must provide the grounds of his entitlement, but Rule 8 generally does not require "detailed factual allegations."  *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1964-65 (2007) (quoting *Conley*, 355 U.S. at 47).  "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Twombly*, 127 S. Ct. at 1969.  "[S]tating such a claim requires a complaint with enough factual matter (taken as true) to suggest" the required elements.  *Id.* at 1965.

In evaluating a motion to dismiss, the court assumes that all factual allegations set forth in the complaint are true, *United States v. Gaubert*, 499 U.S. 315, 327 (1991), and construes all factual allegations in the light most favorable to the plaintiff.  *Brower v. County of Inyo*, 489 U.S. 593, 598 (1989).  To succeed on a motion to dismiss under Rule 12(b)(6), therefore, a defendant must demonstrate that the plaintiff has failed to give sufficient notice of a proper claim and the grounds upon which that claim rests.

A plaintiff asserting security fraud claims must meet heightened pleading requirements to survive a motion to dismiss.  First, plaintiffs' complaint must satisfy  Federal Rule 9(b)'s requirements that "the circumstances constituting fraud ... shall be stated with particularity." Fed. R. Civ. P. 9(b).  Second, plaintiffs' complaint must also meet the pleading requirements of

the Private Securities Litigation Reform Act ("PSLRA"):  "the court shall, on the motion of any

defendant, dismiss the complaint if the requirements of paragraphs [(b)](1) and [(b)](2) are not

met."  15 U.S.C. § 78u-4(b)(3)(A).

 "Although the pleading requirements under the PSLRA are strict, they do not change the

standard of review for a motion to dismiss.  Even under the PSLRA, the district court, on a

motion to dismiss, must draw all reasonable inferences from the particular allegations in the

plaintiff's favor, while at the same time requiring the plaintiff to show a strong inference of

scienter."  *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 78 (1st Cir. 2002)(citations omitted) (citing

*Helwig v. Vencor, Inc.*, 251 F.3d 540, 553 (6th Cir. 2001) (en banc)).

### III.  DISCUSSION

#### A.  Motion to Dismiss by the Birch Capital Defendants

The Birch Capital Defendants move to dismiss the second amended complaint, claiming

(1) lack of *in personam* jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2); and (2) improper venue

pursuant to Fed. R. Civ. P. 12(b)(3).   In the alternative, these Defendants move this court to

transfer the case to the United States District Court for the Southern District of Florida pursuant

to 28 U.S.C. § 1404(a).

#### 1.  Personal Jurisdiction

Plaintiffs' Amended Complaints expressly assert statutory grounds for personal

jurisdiction pursuant to Section 27 of the Securities and Exchange Act of 1934[4], which provides

---

[4]Plaintiffs also rely on the Declaratory Judgment Act, 28 U.S.C. § 2201 and the Interpleader Act , 28 U.S.C. § 1335 as providing jurisdiction over "Scheme Defendants."  They  further note that 28 U.S.C. § 1332(a) would provide an additional basis for federal jurisdiction over claims to the funds interpled, because two or more claimants to the funds are of diverse citizenship.

for nationwide service of process and personal jurisdiction.  Because of this express language,

the Birch Capital Defendants' initial argument, based on an assumption that Plaintiffs assert

jurisdiction under diversity of citizenship, is misplaced.  That assumption resulted in pages of

irrelevant argument regarding jurisdictional requirements under the Due Process Clause of the

*Fourteenth  Amendment* and minimum contacts with the State of Alabama.  As Plaintiffs pointed

out in their opposition brief, a proper analysis of personal jurisdiction in the instant case would

focus instead upon fairness of the forum under the Due Process Clause of the *Fifth Amendment*

and the Eleventh Circuit's decision in *Republic of Panama v. BCCI Holdings*, 119 F.3d 935

(11th Cir. 1997).  Further, Defendants' assumption also led to their incorrect allocation of the

burden of proof.  However, the Birch Capital Defendants' briefs do articulate an alternative Fifth

Amendment claim of unfairness, and the court will address that argument.

      Section 27 of the Securities and Exchange Act, upon which Plaintiffs rely to establish this

court's personal jurisdiction over Defendants, provides as follows:

> The district courts of the United States and the United States courts of
> any Territory or other place subject to the jurisdiction of the United
> States shall have exclusive jurisdiction of violations of this title or the
> rules and regulations thereunder, and of all suits in equity and actions at
> law brought to enforce any liability or duty created by this title or the
> rules and regulations thereunder.  Any criminal proceeding may be
> brought in the district wherein any act or transaction constituting the
> violation occurred.  *Any suit or action* to enforce any liability or duty
> created by this title or rules and regulation thereunder, or to enjoin any
> violation of such title or rules and regulations, *may be brought in any
> such district or in the district wherein the defendant* is found or is an
> inhabitant or *transacts business*, and process in such cases may be
> served in any other district or which the defendant is an inhabitant or
> wherever the defendant may be found. . . .

15 U.S.C. 78aa (1934) (emphasis added).  This statutory provision authorizes nationwide service of process and establishes a statutory basis for personal jurisdiction over the Defendants.  *See U.S.S.E.C. v. Carillo*,115 F.3d 1540 (11th Cir. 1997).

When defendants contest a court's personal jurisdiction over them and raise due process objections, courts in the Eleventh Circuit conduct a two-step analysis.  Step one, the "fair warning requirement," inquires whether the defendant has "purposefully directed his activities at residents of the forum."  *Republic of Panama*, 119 F.3d at 945 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985)).  If a statutory authorization of nationwide service of process applies – as it does in the instant case –  the relevant forum for this inquiry is the United States, not the state in which the district court sits.  *Id.*  Similarly, in such cases, the applicable amendment for due process analysis is not the Fourteenth Amendment – which limits state jurisdiction and power – but the Fifth Amendment – which limits federal jurisdiction and power. *Id.*

In the instant case, the Birch Capital Defendants are domestic defendants.   Marin has chosen to live in Florida and Birch Capital, Inc. is a Florida-based corporation and both enjoy minimum contacts with the United States.  Accordingly, the Birch Capital Defendants have purposefully directed their activities at the United States, and their domestic status necessarily satisfies the first prong of due process.  *See id.* at 945 n. 16.

Yet, the Eleventh Circuit has cautioned that the Fifth Amendment due process analysis may not stop at demonstrating "purposeful availment" within the United States.   Once step one is satisfied, the court must turn to step two and determine "whether the assertion of personal

jurisdiction would comport with 'fair play and substantial justice.'" *Id.* (quoting *Burger King*

*Corp.*, 471 U.S. at 476)).  As the Court of Appeals explained:

> A defendant's "minimum contacts" with the United States do not,
> however, automatically satisfy the due process requirements of the Fifth
> Amendment.  There are circumstances, although rare, in which a
> defendant may have sufficient contacts with the United States as a
> whole but still will be unduly burdened by the assertion of jurisdiction
> in a faraway and inconvenient forum. . . .Therefore, even when a
> defendant resides within the United States, courts must ensure that
> requiring a defendant to litigate in plaintiff's chosen forum is not
> unconstitutionally burdensome. . . .We emphasize that it is only in
> highly unusual cases that inconvenience will rise to a level of
> constitutional concern.

*Republic of Panama*, 119 F.3d 946-47.

The burden is on the defendant, not the plaintiff, to demonstrate constitutionally

significant inconvenience.  *Id.* at 948.  He may do so by a showing that litigating the case in the

forum will be "'so gravely difficult and inconvenient' that [he] unfairly is at a 'severe

disadvantage' in comparison to his opponent."  *Id.*  If a court finds that defendant has

demonstrated constitutionally significant inconvenience, the court must then weigh the federal

interest in litigating the dispute in the chosen forum against the burden that the forum imposes

upon defendant.  *Id.*

In the instant case, the Birch Capital Defendants' argument of inconvenience rests upon

Marin's two affidavits.  (doc.109, Ex. A; doc. 130, Ex. A).  Marin, who is the President and the

only officer/employee of Birch, attests that these Defendants are based in Florida and have no

contacts with the neighboring state of Alabama.  In *Republic of Panama*, the defendant similarly

argued that hauling him into court in Florida to litigate a claim under the RICO statute, when he

10

had a lack of contacts with that state, was an inconvenience that violated due process.  The

Eleventh Circuit disagreed, explaining:

> [A] defendant's contacts with the forum state play no magical role in the
> Fifth Amendment analysis.  "As a practical matter ... state lines cannot
> provide an accurate measure of the burdens that would be imposed on a
> defendant by requiring him to defend an action in a particular forum.
> There is nothing inherently burdensome about crossing a state line."
> [Charles A Wright and Arthur R. Miller, *Federal Practice and
> Procedure,*] § 1067.1, at 327.  Thus, determining whether litigation
> imposes an undue burden on a litigant cannot be determined by
> evaluating only a defendant's contacts with the forum state. . . .The fact
> that they may not have had significant contacts with Florida is insufficient
> to render Florida an unreasonably inconvenient forum.

119 F.3d at 946-47, 948.  The Eleventh Circuit found no constitutional impediment to personal

jurisdiction over the defendants.

Defendants attempt to distinguish the *Republic of Panama* case, noting that the domestic

defendants in that case were large corporations doing business in multiple states and, thus,

presumably suffered less inconvenience in traveling across state lines.  However, courts

addressing Fifth Amendment objections to litigating across state lines have applied the same

principles to small business owners (*see, e.g., BankAtlantic v. Coast to Coast Contractors,

Inc.,*1997 WL 33807846 at *2 (S.D. Fla. 1997)); defunct companies (*see, e.g., Long v.

Sports44.com*, 2007 WL 3072405 at *4 (M.D. Fla. 2007); and individuals (*see, e.g., Depaola v.

Nissan North America, Inc.*, 2005 WL 212225 *6 (M.D. Ala. August 29, 2005)).

In the case that Defendants do rely upon for dismissal, *In re Gentry Steel Fabrication,

Inc.*, 325 B.R. 311 (N.D. Ala. 2005), the court did not dismiss the case or specifically find a lack

of personal jurisdiction; rather,  it granted the alternative motion for transfer of venue.  *Id.* at 318-

319.  It concluded that the interest of justice or the convenience of the parties favored transfer to

California because only one of the factors weighed militated against transfer – the plaintiff's choice of forum.  The remaining factors were neutral or favored transfer; for example, California law would govern the proceedings, three of the four defendants lived in California while only the plaintiff lived in Alabama, and much of the discovery would take place in California.  *Id.*

Accordingly, the Birch Capital Defendants must establish more than lack of contacts with Alabama.  The only other facts that Marin raises to meet his burden are: (1) that he is the sole officer/employee of his business and that his absence during trial will cause a significant disruption to it; (2) that his physical health makes traveling difficult; (3) that his family lives in Florida; and (4) that one potential witness also lives in Florida.  The Birch Capital Defendants do not explain why Marin's absence from Florida – when Birch Capital, Inc. no longer maintains any office space and has no other employees to manage –  would cause a significant disruption to the business. They do not specify how many documents/business records are involved so that the court can evaluate the inconvenience of transporting these records.  They do not articulate why Defendants' one potential witness would have difficulty traveling to Birmingham, what he would say, or whether he would be unwilling to testify here.  They do not point out any circumstances that would render Marin's family unable to function without him during trial.  The one proffered argument that does raise concerns with this court is Marin's claim of impaired health, but Marin has provided no doctor's affidavit or medical records supporting Defendants' position that his health raises a constitutional impediment to litigating in Alabama

The Eleventh Circuit has noted that only in "highly unusual cases [will] inconvenience ... rise to a level of constitutional concern."  *Republic of Panama*, 119 F.3d at 947.  The Birch Capital Defendants have not established that this case is highly unusual.  They have raised

reasons that litigating this case in Alabama would prove to be inconvenient, but this court notes that all litigation inconveniences parties to some degree.  The burden is on the Defendants to demonstrate that the assertion of jurisdiction in Alabama will "make litigation so gravely difficult and inconvenient that [Defendants] unfairly [are] at a 'severe disadvantage' in comparison to [their] opponent."  *See id.* at 948 (quoting *Burger King*, 471 U.S. at 478).  Because the court concludes that the Birch Capital Defendants have not met their burden, the court finds "no infringement of their individual liberty interests protected by the Due Process clause of the Fifth Amendment."  *See id.*  Therefore, the court need not balance the federal interests in litigating the dispute in this forum.

Having found no due process violation, the court will DENY the Motions to Dismiss filed by Birch and Marin.

### 2.  Venue

The Birch Capital Defendants also argue that the court should dismiss this case for improper venue pursuant to F.R. Civ. P. 12(b)(3).  To succeed, Defendants must prove that the filing of the instant case in the Northern District of Alabama falls outside the broad venue provisions of the Security and Exchange Act of 1934.  The venue provisions, like the jurisdictional provisions referenced above, are contained in Section 27 of the 1934 Act, and read as follows:

> Any criminal proceeding may be brought in the district wherein any act or transaction constituting the violation occurred.  Any suit or action to enforce any liability or duty created by this title or rules and regulation thereunder, or to enjoin any violation of such title or rules and regulations, may be brought in any such district or in the district wherein the defendant is found or is an inhabitant or transacts business, and process in such cases may be served in any other district

> or which the defendant is an inhabitant or wherever the defendant may
> be found . . . .

15 U.S.C. 78aa (1934).

Accordingly, Plaintiffs may bring suit in "any such district" "wherein any act or transaction constituting the violation occurred." *Hilgeman v. Nat'l Ins. Co. of Am.*, 547 F.2d 128, 301 (5th Cir. 1977).[5] "The 'act' contemplated by the statute need not be crucial, nor must 'the fraudulent scheme be hatched in the forum state.' But . . .the jurisdictional act cannot be trivial; it must be 'of material importance to the consummation of the scheme.'" *Id.* (quoting *Hooper v. Mountain State Sec. Corp*, 282 F.2d 195, 204-5 (5th Cir. 1960) (internal citations omitted). Defendants "need not be physically present in the forum district nor need [they] commit more than a single act in the district if that act is important to the consummation of the scheme." *Id.* at 302.

The Birch Capital Defendants would have this court restrict venue to fora meeting one of two tests:  (1) whether the defendant resides in the forum; or (2) whether  the claim arose in the forum. (Birch & Marin's Br. 22).  However, Defendants' venue position is based upon a misreading of the United States Supreme Court's decision in *Leroy v. Great W. United Corp.*, 443 U.S. 173 (1979).  When the Supreme Court stated the venue tests to which Birch and Marin refer, it was applying the general federal venue statute, 28 U.S.C. § 1391(b), *not* Section 27 of the Securities Exchange Act of 1934.[6]  Accordingly, this court will not apply the Birch Capital

---

[5]In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11 th Cir. 1981)(en banc), the Eleventh Circuit adopted as precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981.

[6]Although the Fifth Circuit Court of Appeals had  found that venue was proper under Section 1391(b) *and* the 1934 Act's Section 27, the Supreme Court disagreed, finding that the 1934 Act imposed no duty upon the State of Idaho; if the 1934 act did not apply, neither should its venue provisions.

Defendants' restrictive view of venue but, instead, will determine whether at least one Defendant committed at least one act in the Northern District of Alabama that was of material importance to the consummation of the scheme.

In the instant case, Plaintiffs have sued multiple Scheme Defendants, asserting a common scheme of acts – Scheme Defendants' acting in concert with one another to intentionally and fraudulently manipulate the stock price of ALVN – in violation of the 1934 Act.  Plaintiffs have alleged that the Scheme Defendants invaded the accounts of Sierra to create, via the Automated Financial System, a series of fraudulent purchase orders, pumping up the price of ALVN.  Those fraudulent purchase orders were then routed to Sterne Agee's trading desk to be executed and later dumped at an artificially inflated price.   Thus, the alleged acts that occurred in the Northern District of Alabama included the creation through computer systems involving interstate commerce of (1) fraudulent buy orders on ALVN stock; and subsequent (2) order-execution/sell entries regarding fraudulently inflated ALVN stock, all orders that were reflected on Sterne Agee's books and records in Birmingham, Alabama.  The court finds that each of the acts that allegedly occurred in this district was a material, non-trivial step in the consummation of the alleged unlawful price manipulation scheme.

Further, the court need not find "one act" committed in the forum by *each* of the defendants. When "an action is brought against multiple defendants, alleging a common scheme of acts or transactions in violation of securities statutes, so long as venue is established for any of the defendants in the forum district, venue is proper as to all defendants.  This is true even in the absence of any contact by some of the defendants in the forum district." *Secs. Investor Protection Corp. v. Vigman*, 764 F.2d 1309, 1317 (9th Cir. 1985) (citing Wright, Miller &

Cooper, *Federal Practice & Procedure: Jurisdiction* § 3824 (1976)); *see Hilgeman*, 547 F.2d at

302, n. 12.   Accordingly, venue is proper in the Northern District of Alabama.

### 3.  Transfer under 1404(a)

Alternatively, the Birch Capital Defendants move this court to transfer  the case, pursuant

to 28 U.S.C. § 1404(a), to the United States District Court for the Southern District of Florida.

That statute provides as follows.

> For the convenience of the parties and witnesses, in the interest of justice,
> a district court may transfer any civil action to any other district or division
> where it might have been brought.

28 U.S.C. § 1404(a).  The moving party bears the burden of demonstrating that the interests

weigh strongly in favor of transfer.  *In re Ricoh Corp.*, 870 F. 2d 570, 573 (11th Cir. 1989);

*Bartronics, Inc. v. Power-One, Inc.*, 510 F. Supp. 2d 634, 637 (S.D. Ala. 2007).  When

conducting a balance of competing interests pursuant to a motion to transfer, the court should

consider the following: "convenience of the parties, convenience of witnesses, access to

evidence, availability of process to compel the presence of unwilling witnesses, and the interests

of justice."  *Long*, 2007 WL 3072405 at *7.

In this case, Plaintiffs chose Alabama as the forum of this action, and one of the two

Plaintiffs, Sterne Agee, is a resident of the Northern District of Alabama with its principal place

of business here.  The Scheme Defendants are not all residents of the same state, but are spread

out among several states – New York, New Jersey, and Florida – and one Scheme Defendant is

located outside the United States in the Bahamas.  Given the disparate locations of parties,

witnesses, and documents, a balance of conveniences does not favor transferring the case to

Florida.  While that location would undoubtedly be convenient for Marin, who represents Birch

Capital's sole officer/employee, and for one witness, who also lives in Florida, the transfer would represent a countervailing inconvenience for Sterne Agee and the many Birmingham officers, employees, and witnesses it intends to call.  All parties have active counsel in the Northern District of Alabama.  No party has provided evidence that venue in the Southern District of Florida would provide greater availability of compulsory process to secure the attendance of witnesses, except for Marin's lone witness.  As noted earlier, Marin's physical health is a concern, yet the problems he mentions in his affidavit vary widely in their effects, from mild to debilitating; however, Marin presented no medical testimony establishing the severity of his problems and supporting his difficulty in traveling.

As is clear from this discussion, the Birch Capital Defendants have the burden to show that the balance of interests weighs strongly in favor of transfer to the Southern District of Florida.  They have not met their burden.  Accordingly, this court will DENY the motion to transfer under 1404(a).

In summary, the court will

- DENY the Birch Capital Defendants' motion to dismiss;

- DENY the Birch Capital Defendants' alternative motion for transfer of venue under 1404(a).

### B.  Motions to Dismiss by Zangara Defendants

The Zangara Defendants move to dismiss for failure to state a claim under Federal Rule 12(b)(6); for lack of personal jurisdiction under Federal Rule 12(b)(2); for mandatory submission to arbitration, as required by the Financial Industry Regulatory Authority; and for lack of venue

under Federal Rule 12(b)(3).  Reviewing the numerous arguments, the court notes with disfavor their presentation of many shotgun arguments with little or no chance of success. Acknowledging some chagrin, the court will nevertheless consider each argument below.

### 1. *Failure to State a Claim under 12(b)(6)*

The Zangara Defendants present several arguments in favor of dismissal under Rule 12(b)(6): (a) Counts brought under the Securities Exchange Act of  1934 ("the 1934 Act')  fail to satisfy the pleading standards of Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA"); (b) Plaintiffs fail to plead causation; and  (c) Plaintiffs lack standing under the 1934 Exchange Act.

**(a.) Pleading Standards for Claims under the 1934 Act**

Plaintiffs' Amended Complaints contain four counts that involve claims of security fraud under the 1934 Act:  Count I, Request for money damages resulting from a market manipulation scheme in violation of the 1934 Act; Count II, Request for injunctive relief prohibiting settlement of the fraudulently-ordered trades; Count III, Request for declaratory judgment as to Scheme Defendants; and Count IV, Request for attorneys fees and costs as well as indemnity and contribution from Scheme Defendants. Plaintiffs claim that the Zangara Defendants instituted a scheme of "market manipulation" and

> by use of means or instrumentalities of interstate commerce, directly or indirectly, have violated Section 10(b) of the 1934 Act and Regulation 10b-5 thereunder, by:
>
> (a) employing devices, schemes, or artifices to defraud;
> (b) making untrue statements of material facts or omissions of material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

>    (c) engaging in acts, practices or courses of business which operated or
>    would operate as a fraud or deceit upon persons.

(Pl.'s Compl. ¶ 31).

The Zangara Defendants argue that the Amended Complaints' securities fraud allegations do not meet the specificity required by the PSLRA and Rule 9(b).  Indeed, both the PSLRA and Rule 9(b) have heightened pleading requirements for fraud.  Rule 9(b) requires that all averments of fraud "must state with particularity the circumstances constituting fraud or mistake. . . ." Fed. R. Civ. P. 9(b). The PSLRA includes the following specificity requirement under paragraph (b)(1):

>    the complaint shall specify each statement alleged to have been
>    misleading, the reason or reasons why the statement is misleading, and,
>    if an allegation regarding the statement or omission is made on
>    information or belief, the complaint shall state with particularity all facts
>    on which that belief is formed.

15 U.S.C. § 78u-4(b)(1).  Further, the PSLRA provides under paragraph (b)(2):

>    In any private action arising under this chapter in which the plaintiff may
>    recover money damages only on proof that the defendant acted with a
>    particular state of mind, the complaint shall, with respect to each act or
>    omission alleged to violate this chapter, state with particularity facts
>    giving rise to a strong inference that the defendant acted wit the required
>    state of mind.

15 U.S.C. § 78u-4(b)(2).

The court notes that Rule 9(b) applies to "all averments of fraud . . . including, of course, all claims of securities fraud." *In re Initial Public Offering Sec. Litig.,* 241 F. Supp. 2d 281, 334-35 (S. D. N. Y. 2003).  However, the heightened pleading requirements of the PSLRA only apply to certain categories of fraud claims brought under the 1934 Act:

[P]aragraph (b)(1) of the PSLRA only applies to a subset of claims brought under the Exchange Act.  In particular, it applies to 'any private action arising under this chapter [of the Exchange Act] in which the plaintiff alleges that the defendant

> (A) made an untrue statement of material fact; or

> (B) omitted to state a material fact necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading.

15 U.S.C. §78u-4(b)(1).  Consider, for example, Rule 10b-5, which makes it unlawful:

> (a) To employ any device, scheme, or artifice to defraud,
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statement made, in light of the circumstances under which they were made, not misleading, *or*
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5(a)-(c) (emphasis added).  While claims under Rule 10b-5(b) must always satisfy paragraph (b)(1)'s statutory requirement, claims brought under Rule 10b-5(a) or 10b-5(c) need not if they do not rely upon misstatements or omissions (*e.g.,* if they allege market manipulation).

Paragraph (b)(2) applies to "any private action arising under this chapter [of the Exchange Act] in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind."  15 U.S.C. § 78u-4(b)(2).  In contrast to paragraph 9(b)(1), *all* claims brought under Rule 10b-5 must satisfy paragraph (b)(2) because all such claims require proof that defendant acted with intentional or reckless state of mind.

*In re Initial Public Offering,* 241 F. Supp. 2d at 334-35.

Accordingly, a plaintiff must satisfy Rule 9(b) except in the specific areas where the PSLRA supercedes the Federal Rules: the PSLRA's (b)(1) elements involving material misstatements and omissions; and the PSLRA's (b)(2) elements of scienter.  *See id.* at 335. Because Plaintiffs' Amended Complaints include claims under all three sub-parts of Rule 10b-5

of the 1934 Act and because the interplay of Rule 9(b) and the PSLRA varies depending upon which subpart is invoked, the court will address them accordingly.

(a) 1.  *Market Manipulation under 10b-5(a) & 10b-5(c)*

To the extent that Plaintiffs allege market manipulation under Rule 10b-5(a) or 10b-5(c) – which do *not* involve material misstatements or omissions –  Plaintiffs must satisfy two specificity requirements:   Rule 9(b) of the Federal Rules of Civil Procedure and the scienter requirements of the PSLRA.  *See, e.g., In re Initial Public Offering,* 241 F. Supp. 2d at 334-35. In other words, except for the "scienter" requirements, the specificity requirements of 9(b) – not those of the PSLRA – apply.

(a) 1. a.  *9(b) Specificity*

The Zangara Defendants first argue that the court should dismiss them because the Amended Complaints contain no allegations that they were connected to the crucial account invasions.  The court disagrees.

A claim for market manipulation must indeed be pled with particularity under Rule 9(b). *ATSI Commc'n, Inc. v. The Shaar Fund, Ltd.*, 493 F.3d 87, 102 (2nd Cir. 2007).  "A claim for manipulation, however, can involve facts solely within the defendant's knowledge; therefore, at the early stages of litigation, the plaintiff need not plead manipulation to the same degree of specificity as a plain misrepresentation claim."  *ATSI*, 483 F.3d at 102*; cf. Rombach v. Chang*, 355 F.3d 164, 175 n. 10(2d  Cir. 2004) (relaxing the standard where information was likely to be in the exclusive control of defendants).  Courts have recognized that plaintiffs pleading market manipulation are unlikely to know all of the scheme mechanics.  *In re Blech Sec. Litig.,* 961 F. Supp. 569, 580 (S.D.N.Y. 1997) (referred to as *"Blech II")*.  Consequently, courts have found

21

that plaintiffs alleging a market manipulation scheme have met the requirements of Rule 9(b)

when they plead with particularity "the nature, purpose and effect of the fraudulent conduct and

the roles of defendants."  *See id; see also In re Blech Sec. Litig.*, 928 F. Supp. 1279, 1291

(S.D.N.Y. 1996) (referred to as "*Blech*" or "*Blech I*").  "This test will be satisfied if the complaint

sets forth, to the extent possible, 'what manipulative acts were performed, which defendants

performed them, when the manipulative acts were performed, and what effect the scheme had on

the market for the securities at issue.'" *ATSI*, 483 F.3d at 102 (quoting *Baxter v. A.R. Baron &

Co.*, 1994 WL 600720, at \*6 (S.D.N.Y. Oct. 12, 1994)).

 In the instant case, Plaintiffs have met this test for pleading market manipulation under

10b-5(a) and 5(c).  First, Plaintiffs allege a series of acts designed to manipulate the market in a

"pump and dump" scheme.  For example, they have asserted that, prior to May 10, 2007, the

Zangara Defendants and other "Scheme Defendants"  – including Defendant Eddie Marin,

allegedly linked with a company "busted for stock spam fraud" – transferred millions of shares of

ALVN stock among themselves to artificially increase its trade volume, listing with specificity

the dates of transfer, the number of shares transferred, the transferors, and transferees.  (Pl.'s 2d

Am. Compl. ¶ 17).   Plaintiffs listed specific dates, prior to May 10, 2007, on which the ALVN

stock was the subject of "significant email spamming activity."  (Pl.'s 2d Am. Compl. ¶ 18).

Plaintiffs state the locations of accounts invaded without authorization and provide information

about the subsequent issuance of fraudulent "buy" orders on ALVN stock.  Although Plaintiffs

did not list the name of the person or entity who invaded accounts, they listed the specific date –

May 10, 2007 –  and times when certain accounts were invaded, as well as the number of ALVN

shares involved and the location of the accounts.  (Pl.'s 2d Am. Compl. ¶¶ 19-21 ). Plaintiffs

provide the name of the owner of at least one of the accounts invaded.  (Pl.'s 2d Am. Compl. ¶

20).  Plaintiffs also allege facts regarding the sale of large numbers of ALVN stock by "Scheme

Defendants" – including the Zangara Defendants – on May 10, 2007, listing the number of

ALVN stocks that each Defendant sold, the average price of the stock sold, and the one-day gross

scheme profit for each Defendant.  (Pl.'s 2d Am. Compl. ¶¶ 23-25).  Accordingly, the court finds

that Plaintiffs have pled with enough specificity "what manipulative acts were performed, which

defendants performed them, [and] when the manipulative acts were performed."  *See ATSI*, 483

F.3d at 102.

Plaintiffs' Amended Complaints also include the effect of this scheme on the market for

the ALVN securities, listing the specific price increase of ALVN stock on May 10, 2007 (from

17 cents a share to over 40 cents a share), the percentage increase in a six-hour time period

(238%),  and the trading volume change from May 9, 2007 (21,000 shares) to May 10, 2007 (2.2

million shares). (Pl.'s 2d Am. Compl. ¶¶22, 26).

Further, Plaintiffs' Amended Complaints also state the purpose of this scheme: "to

manipulate the market for the ALVN stock by driving up the trading volume and price per share

of ALVN" and then "dump[ing] large amounts of . . . ALVN shares at articially-inflated prices . .

. ." (Pl.'s 2d Am. Compl. ¶¶ 22, 26).

Having found that the Plaintiffs have met the requirements of Rule 9(b) and Rule 12(b)(6)

with respect to their claims of market manipulation under 10b-5(a)& (c), the court will next

address whether Plaintiffs have pleaded scienter with specificity.

*(a). 1. b. Scienter*

23

The PSLRA standards  apply and supercede the Federal Rules when pleading scienter in a securities fraud claim *See  In re Initial Public Offering,* 241 F. Supp. 2d at 335 (citing S. Rep. No. 104-98, at 15 ).  "This [statutory] requirement alters the usual contours of a Rule 12(b)(6) ruling because, while a court continues to give all reasonable inferences to plaintiffs, those inferences supporting scienter must be strong ones."  *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1264  (11th Cir. 2006) (quoting *In re Cabletron Sys.*, 311 F.3d 11 (1st Cir. 2002)). Paragraph (b)(2) of the PSLRA establishes the specificity required, and requires a plaintiff to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2); *see Garfield v. NDC Health Corp.*, 466 F.3d at 1264 (quoting 15 U.S.C. § 78u-4(b)(2)) .  The Eleventh Circuit has noted that "factual allegations may be aggregated to infer scienter and must be inferred for each defendant with respect to each violation." *Phillips v. Scientific-Atlanta, Inc.*, 374 F.3d 1015, 1016 (11th Cir. 2004).

In *Novak v. Kasaks,*  the Second Circuit explained two ways that a plaintiff may satisfy the scienter requirement: a plaintiff may plead (1) "motive and opportunity;" or (2) "strong circumstantial evidence of conscious misbehavior or recklessness."  216 F.3d 300, 310-11 (2d Cir. 2000).  Because the PSLRA adopted the Second Circuit's "strong inference" standard, Second Circuit cases interpreting the "strong inference" language provide guidance.  *Id.*  The Second Circuit Court of Appeals has summarized that guidance as follows:

> These cases suggest, in brief, that the [strong] inference may arise where the complaint sufficiently alleges that the defendants: (1) benefitted in a concrete and personal way from the purported fraud . . ., (2) engaged in deliberately illegal behavior . . ., (3) knew facts or had access to information suggesting that their public statements were not accurate . . .; or (4) failed to check information they had a duty to monitor. . . .

*Id.* at 311.

In their Amended Complaints in the instant case, Plaintiffs include facts that they "benefitted in a concrete and personal way from the purported fraud."  As noted previously, the Amended Complaints specified how the Zangara Defendants, and the company they controlled, sold 400,000 shares of ALVN stock on May 10, 2007 for a gross scheme profit of apparently $149,500. (Pl.'s 2d Am. Compl. ¶ 24).  Other allegations in the Amended Complaints spell out the Zangara Defendants "motive and opportunity" (¶¶ 5, 12, 13, 15, 17, 18, 21, 24, 26, 32) and "strong circumstantial evidence of conscious misbehavior" (¶¶ 5, 17, 18, 21, 24, 26, 32, 33). Accordingly, the court finds that Plaintiffs have met their burden of pleading with specificity facts giving rise to a strong inference that the Zangara Defendants acted with the required scienter.

Having found that the Plaintiffs have met their burden of pleading the market manipulation scheme with the specificity required by Rules 9(b) and 12(b)(6) and finding, further, pleading scienter with the specificity required by the PSLRA, the court will DENY the Zangara Defendants' motion to dismiss the claims of market manipulation under 10b-5(a) & 10b-5(c).

   a. (2).   *Market Manipulation under 10b-5(b)*

In their Second Amended Complaints, Plaintiffs also claim to be traveling under Regulation 10b-5(b)[7]; they accuse Defendants of "making untrue statements of material facts or

---

[7]The court notes that some variance exists among the circuits regarding proper pleading of securities fraud claims after the PSLRA, particularly when Plaintiffs have alleged misstatements and/or omissions under Regulation 10b-5(b).  For example, the Second Circuit applies only the PSLRA requirements to such claims, reasoning that the PSLRA supercedes Rule 9(b) with respect to the elements that the PSLRA explicitly mentions (scienter and material misrepresentations and omissions).  *See, e.g., In re Initial Public Offering*, 241 F. Supp. 2d at 334-35.
   The Eleventh Circuit, however, appears to apply both Rule 9(b) *and* paragraphs (b)(1) and (b)(2) of the

omissions of material facts necessary in order to make the statements made, in light of the

circumstances under which they were made, not misleading." (Pl.'s 2nd Am. Compl. ¶ 31(b)).

    The Eleventh Circuit has explained:

> To allege securities fraud under Rule 10b-5[b], a plaintiff must show: 1) a misstatement or omission, 2) of a material fact, 3) made with scienter, 4) on which plaintiff relied, 5) that proximately caused his injury. *Bryant [v. Avado Brands, Inc.*, 187 F.3d 1271, 1281 (11th Cir. 1999)].
>     . . .
> Rule 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. P. Rule 9(b). "Rule 9(b) is satisfied if the complaint sets forth '(1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud.' *Ziemba v. Cascade Int'l, Inc.,* 256 F.3d 1194, 1202 (11 th Cir. 2001) (quoting *Brooks v. Blue Cross and Blue Shield of Florida, Inc*., 116 F.3d 1364, 1371 (11 th Cir. 1997). "A sufficient level of factual support for the [10b] claim may be found where the circumstances of the fraud are pled in detail. 'This means the who, what, when where, and how: the first paragraph of any newspaper story.'" *Gross v. Medaphis Corp.*, 977 F. Supp. 1463, 1470 (N.D. Ga. 1997) (quoting *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990)).
>     . . .
> For claims brought under the Exchange Act, including Appellants' claims under Section 10b and Section 20a, the complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).

*Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1261, 1262 (11 th Cir. 2006).

---

PSLRA to misstatements and omissions. *See Garfield v. NDC Health Corp.*, 466 F.3d 1255 (11th Cir. 2006). Accordingly, this court will analyze these claims under both Rule 9(b) and the PSLRA.

While Plaintiffs' Second Amended Complaints allege many specific "acts" of market

manipulation, their averments of misstatements and omissions are limited to the following

18.    Prior to May 10, 2007, ALVN had been the subject of significant spamming activity.  In fact, ALVN was the subject of significant email spamming activity on April 20, 2007, and April 27, 2007, shortly before the May 10, 2007 fraudulent trades, and shortly after the two million share transfer between BMF and Birch Capital and the resulting consulting agreement between them.

19.    Between 9:34 am and 10:22 am on May 10, 2007, two accounts at West Park Capital were invaded, and a series of unauthorized and fraudulent "buy" orders for a total of 109,400 shares of ALVN were issued from these accounts.

20.    About an hour and a half later that same day, the account maintained by the Louise E. Rehling Trust ("Account") with Plaintiff Sierra Equity Group, Ltd. ("Sierra") was also invaded, and a series of unauthorized and fraudulent "buy" orders for a total of approximately 2.2 million shares of ALVN were issued for the Account.

21.    After the close of business on May 10, 2007 (in other words, after the large volume of "buy" orders for ALVN stock had just been entered during the preceding trading hours), the Company Art4Love, whose shares trade as ALVN, issued a press release containing positive news about the company.  Given the substantial holdings of certain defendants in ALVN and their close relationship with Art4love (sic), the fraudulent market manipulation scheme was without any doubt launched on May 10, 2007 to correspond with this press release to make it look like the substantial increase in the price of ALVN that occurred a (sic) result of the scheme was related to this press release.

26.    Present here is a classic pump and dump market manipulation scheme that violates the federal securities laws and which was orchestrated and conducted in concert and in conspiracy by Defendants Birch Capital, BHI, Glenwood, BMF, Frank Zangara, Therese Zangara, Marin, Manfredonia and Miller, and likely with aiding and abetting assistance from others presently unknown to Plaintiffs.  In this particular case, the accounts of Sierra and West Park Capital were invaded for the purpose of generating a series of fraudulent purchase orders for shares of ALVN that were designed to pump up the market price of ALVN.  The invasions had the desired result, and the price of ALVN stock rose by **238%** in a little over six hours.  The purchase orders were fraudulent and were made without knowledge or consent of the account owners or the brokerage firms, and were made to look as if they had initiated the purchase orders.  In addition, Birch Capital, BHI, Glenwood, BMF, Frank Zangara, Therese Zangara, Marin, Manfredonia and Miller initiated sales orders that filled the fraudulent buy orders entered on behalf of the invaded accounts and which allowed the Scheme Defendants to dump large amounts of their ALVN shares at artificially-inflated prices, thereby completing their scheme.

31.    In instituting their scheme of market manipulation as described above, Scheme Defendants, acting in concert and conspiracy and possibly aided and abetted by others presently unidentified, in connection with both the purchases and sales of ALVN securities, by use of means or instrumentalities of interstate commerce, directly or indirectly, have violated Section 10(b) of the 1934 Act and Regulation 10b-5 thereunder, by:
(a) employing devices, schemes, or artifices to defraud;
(b) making untrue statements of material facts or omissions of material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c) engaging in acts, practices or courses of business which operated or would operate as a fraud or deceit upon persons.

32.     The activities of the Scheme Defendants, acting in concert and conspiracy and possibly aided and abetted by others presently unidentified, that were and are violative of § 10(b) of the 1934 Act and Rule 10-5 thereunder include but are not limited to:

(a) . . . .

(b) Placing or causing to be entered orders for the purchase of ALVN stock with the knowledge that orders of substantially the same amounts (when taken in the aggregate), on the same day and at substantially similar prices, for the sale of ALVN had been or would be entered by or for the accounts of other members of the conspiracy and the persons acting in concert; and placing or causing to be entered orders for the sale of ALVN stock with the knowledge that orders of substantially the same amounts (when taken in the aggregate), on the same day and at substantially similar prices, for the purchase of ALVN had been or would be entered by or for the accounts of other members of the conspiracy and the persons acting in concert;

(e) Disseminating or causing to be disseminated to the public and the marketplace information that the price of ALVN was likely to rise.

33.     At all times, Scheme Defendants acted with willful and intentional scienter, with deliberate intent to manipulate the market in ALVN and to profit from such manipulation at the concomitant expense and loss of both unknowing investors and market participants such as Plaintiffs who would be caught with ALVN stock after the pump and dump scheme was successfully executed.  In addition to these manipulative courses of conduct, which are non-verbal violations of Rule 10b-5, the Scheme defendants also knowingly violated Rule 10b-5 when they omitted to disclose to Plaintiffs and the Nominal Defendants their wrongful schemes, plans and intentions, and knowingly omitted to disclose the actions they had taken and were taking, including those listed in paragraphs 17 through 26 and 32.  These omissions took place in each communication by which each of the ALVN trades was ordered or requested or initiated or transmitted, and also took place in each communication that subsequently occurred when transfers or intermediary actions among Nominal Defendants and Plaintiffs in the ALVN marketplace occurred on May 10, 2007.

Although all of these averments – and other "acts" alleged – aggregate to plead with

sufficient specificity market manipulation under 5(a) & (c), they do not plead "misstatements"

with the specificity required by 9(b) and paragraph (b)(1) of the PSLRA.  For example, the

reference to ALVN issuing "press releases containing positive news about the company" does not

specify the exact content of the "positive news," explain why the positive news was misleading,

state who issued the positive news on behalf of ALVN, etc.  As a similar example, when

Plaintiffs allege that Scheme Defendants were "disseminating or causing to be disseminated to

the public and the marketplace information that the price of ALVN was likely to rise," they do

not explain why this statement is misleading.  Additionally, references to spamming activity –

without specifying the content of the spam – do not meet the PSLRA or 9(b) pleading standards.

The court also notes Plaintiffs' reference to "omissions" in paragraph 33 of the Second

Amended Complaint.  To the extent that Plaintiffs allege a fraudulent omission under 10b-5(b)

for each ALVN trade ordered or entered, the court finds that Plaintiffs have not met the pleading

requirements of 9(b) and paragraph (b)(1) of the PSLRA.  However, as noted previously, the

alleged fraudulent trades can represent acts which support a market manipulation scheme under

10b-5(a) & (c).  Accordingly, the court will GRANT the Zangara Defendants' motion to dismiss

to the extent that Plaintiffs allege misrepresentations and omissions pursuant to 10b-5(b).

**(b.) Causation**

In their motion to dismiss, the Zangara Defendants insist that Plaintiffs have not stated a

proper claim because they have not accused these specific Defendants with the central wrongful

act of account invasion.  If Plaintiffs fail to connect the Zangara Defendants to the account

invasion, then – the argument goes – no nexus exists between the Zangara Defendants and

Plaintiffs' loss.  The court disagrees.

In paragraph 32 of the Second Amended Complaint, Plaintiffs do allege that the "Scheme

Defendants" – a term that includes the Zangara Defendants – caused the execution of

unauthorized and fraudulent buy orders on May 10, 2007.  Accordingly, Plaintiffs have alleged a

causal connection.

In addition to this allegation, the Second Amended Complaint contains further allegations

of concerted action to artificially manipulate the market.  Contrary to the Zangara Defendants'

contentions, courts have found that allegations of concerted action to manipulate the market in a

stock is sufficient to plead loss causation.  *See, e.g., In re Adler, Coleman Clearing Corp.*, 469 F.

Supp. 2d 112, 126 (S.D.N.Y. 2007) (finding that "market manipulation by means of concerted

short selling calculated to articially bring down the price of stocks constitutes harmful conduct

sufficient to establish loss causation") (citing *Compudyne Corp. v. Shane*, 453 F. Supp. 2d 807,

827 (S.D.N.Y. 2006)).  Plaintiffs have alleged that the Zangara Defendants played an important

role in a market manipulation scheme that involved fraudulent account invasion and that resulted

in artificial price increase in ALVN stock before Defendants attempted to "dump" their ALVN

shares.  These allegations, if true, sufficiently plead loss causation.

 Having found that Plaintiffs have sufficiently alleged causation, the court will DENY the

Zangara's motion on that ground.

### (c.)  Standing

The Zangara Defendants also argue that Plaintiffs' Second Amended Complaint fails to

state a claim under the 1934 Act because Plaintiffs are not purchasers or sellers of the ALVN

securities and, consequently, have no standing.  However, Plaintiffs claim standing under the

1934 Act as "forced purchasers."

Courts have recognized standing under Section 10(b) for securities brokers who become

"forced" purchasers when they have suffered damages arising from their responsibility to

guarantee payment for their customers' trades.  *See, e.g.*, *A.T. Brod & Co. v. Perlow*, 375 F.2d

393, 395-97 & n.3 (2nd Cir. 1967) (finding that broker had standing where it was "compelled to

sell, at a loss, securities that it was holding for a client who refused to pay for them); *Epstein v.*

*Haas Sec. Corp.*, 731 F. Supp. 1166, 1183-84 (S.D.N.Y. 1990) (finding that a clearing firm had

standing to assert a claim under Section 10(b) when it made a payment for securities purchased

by an introducing firm for its customers); *Rooney Pace, Inc. v. Reid*, 605 F. Supp. 158, 160-61 (S.D.N.Y. 1985) (finding that brokerage firm had standing to sue for losses it suffered when a customer failed to pay for securities purchased as a part of a manipulative scheme); *In re Adler, Coleman Clearing Corp.*, 247 B.R. 51, at 125-26 (Bkrtcy. S.D.N.Y. 1999) (finding that the trustee for a clearing broker had standing to pursue 10(b) claim when the purpose of the litigation was to avoid paying for the securities and when the broker would have to pay for the securities if the trustee did not prevail in the litigation).

In the instant case, Plaintiffs allege that they will be forced purchasers if the ALVN trades are allowed to "settle." If that event occurs and Plaintiff Sierra is required to cover the fraudulent trades in ALVN for its customer, it will be a forced out of business and Plaintiff Sterne Agee would, in turn, be required to cover the fraudulent trades. Accordingly, the court finds that both Plaintiffs represent "forced purchasers" for standing purposes; it will DENY the Zangara Defendants' motion to dismiss based on Plaintiffs lack of standing to pursue a claim under the 1934 Act.

In summary, with respect to Plaintiffs' motion to dismiss for failure to state a claim under Rule 12(b)(6), the court

- will DENY the Zangara Defendants' motion to dismiss the claims of market manipulation under 10b-5(a) & 10b-5 (c);

- will GRANT the Zangara Defendants' motion to dismiss to the extent that Plaintiffs allege misrepresentations and omissions pursuant to 10b-5(b);

- finds that Plaintiffs have adequately pled causation;

- finds that Plaintiffs have standing to sue.

*2. Lack of Personal Jurisdiction under 12(b)(2)*

The Zangara Defendants' base their 12(b)(2) argument for lack of personal jurisdiction upon the Plaintiffs' inability to state a claim under the 1934 Act.  Because Plaintiffs have stated a valid claim under the 1934 Act, nationwide personal jurisdiction applies and Plaintiffs' arguments regarding lack of contacts with the State of Alabama are inapposite.  (See the prior discussion of this issue, pp.7-12).  As domestic Defendants, the Zangara Defendants have minimum contacts with the United States; thus, the Northern District of Alabama's invocation of personal jurisdiction over them is constitutional under the Act unless they meet their burden of demonstrating that litigating in Birmingham poses a constitutionally significant inconvenience. *Republic of Panama*, 119 F.3d at  947.  The Eleventh Circuit has noted that only in "highly unusual cases [will] inconvenience ... rise to a level of constitutional concern." *Republic of Panama*, 119 F.3d at 947.  inconveniences parties to some degree.    Because the court concludes that Defendants have not met their burden, the court finds "no infringement of their individual liberty interests protected by the Due Process clause of the Fifth Amendment." *See id.* Therefore, the court need not balance the federal interests in litigating the dispute in this forum.

*3.  The Applicability of FINRA Arbitration Requirements*

The Zangara Defendants' next argument is that the court should dismiss this action because Plaintiffs, as FINRA members, must submit the instant dispute to arbitration instead of pursuing litigation.  They base their argument upon the following provisions from the Financial Industry Regulatory Authority ("FINRA")  and the National Association of Securities Dealers ("NASD") Code:

It may be deemed conduct inconsistent with just and equitable principles of trade and a violation of Rule 2110 for a member or a persona associated with a member to:

(a) fail to submit for arbitration under the NASD Code of Arbitration Procedure ("Code") as required by the Code.

FINRA Rule IM-12000.

[Parties must arbitrate a dispute under the code if:]

- Arbitration under the Code is either:
     (1) Required by a written agreement; or
     (2) Requested by a customer;
- The dispute is between a customer and a member or associated person of a member; and
- The dispute arises in connection with the business activities of the member or associated person.

NASD Code Rule 12220.

A Customer shall not include a broker dealer. . . .For the purposes of this Code the term 'member' means any broker or dealer admitted to membership in NASD [FINRA]. . . . .

FINRA Rule 12100(i); & (o).

"Arbitration is a matter of contract. . . ." *Deloitte Noraudit A/S v. Deloitte Haskins & Sills, U.S.*, 9 F.3d 1060, 1063-64 (2nd Cir. 1993). The Zangara Defendants acknowledge that no contract exists between them and either Plaintiff. They also acknowledge that they did not purchase or sell securities through the Plaintiffs or through someone directly associated with the Plaintiffs. They argue that their ability to compel arbitration arises not out of any contractual relationship with Plaintiffs but, rather, out of Plaintiffs' *membership* in FINRA. Indeed, no dispute exists that Plaintiffs are FINRA members and that the FINRA/NASD provisions quoted above apply to them as members. Accordingly, whether the FINRA/NASD arbitration

provisions apply to the instant situation depends upon whether the Zangara Defendants are "customers" within the meaning of those provisions.  The Zangara Defendants say "yes" and the Plaintiffs, predictably, say "no."

Courts have interpreted "customer" in the NASD Code to require either the purchase of securities from the NASD member, or some business relationship – whether formal or informal – between the member and the investor seeking to compel arbitration.  *See, e.g., John Hancock Life Ins. Co. v. Wilson*, 254 F.3d 48, 59 (2d Cir. 2001) (finding that "the term 'customer' plainly refers to either the member['s] or the associated person['s] customer"); *Fleet Boston Robertson Stephens, Inc. v. Innovex*,  264 F.3d 770, 772-3 (8th Cir. 1993) (stating "we do not believe that NASD Rules require a member to submit to arbitration in every dispute that involves its business activities with a non-member").

The Zangara Defendants argue that this court should extend the term "customer" to include investors in securities who have been sued in connection with the sale and/or purchase of securities *even if those investors had no relationship with the NASD members in question.*  Put another way, they claim that  "customer" does not necessarily mean customer of the person against whom the arbitration provision is invoked; as long as they are in a dispute because of the sale and/or purchase of securities, then they are *someone's* securities customer and can invoke the arbitration provisions against *any NASD member.*

The cases the Zangara Defendants cite in support of this proposition do not require direct privity of contract between the "customer" and the NASD member.  *See Mony Sec. Corp. v. Bernstein*, 390 F.3d 1340, 1344 (11th Cir. 2004) (holding that customer of person associated with Mony Securities was a "customer" of Mony Securities within the meaning of the NASD

Code); *John Hancock,* 254 F.3d at 59 (stating "customer" means "either the member['s] or the associated person['s] customer"). Yet, in both cases, the "customer" who invoked the arbitration clause bought investments through an affiliate of the NASD member. The courts in both cases held that the associate of the NASD member formed a nexus between the investor and the NASD member. However, those cases do not stretch the definition of customer to the limits that the Zangara Defendants now present to this court. They are asking this court to define "customer" to include someone who has no nexus with the NASD member at all. The court can find no support for such a broad definition.

"[A] party cannot be required to submit to arbitration in any dispute which he has not agreed so to submit." *AT&T Tech. Inc. v. Commc'n Workers of Am. ,* 475 U.S. 643, 648 (1968). In the instant case, Plaintiffs did not enter into a contract or any business relationship with the Zangara Defendants. They did not associate with anyone who entered into a contract or a business relationship with the Zangara Defendants. The mere fact that the Zangara Defendants were *someone's* securities customers does not mean that they can invoke the NASD provisions against the Plaintiffs.

The court finds that the Zangara Defendants are not customers within the meaning of the FINRA/NASD Code and, thus, they cannot compel arbitration in the instant case. Accordingly, the court will DENY the motion to dismiss on the grounds that Plaintiffs must arbitrate these claims.

### 4. 12(b)(3) Venue

The Zangara Defendants' final argument for dismissal is that Plaintiffs have not stated a valid claim under the 1934 Act and that venue is improper against these Defendants under the

Exchange Act.  Because Plaintiffs *have* indeed stated a valid claim under the 1934 Act and because they properly rely on Section 27 of the 1934 Act to establish venue, the Zangara Defendants' arguments are incorrect.  In the alternative, they raise the same arguments attacking venue as the Birch Capital Defendants did.  This court rejects these alternative arguments for the same reasons stated previously.  Accordingly, the court finds that venue is proper in the Northern District of Alabama for the Zangara Defendants.

Having found that the Plaintiffs' Second Amended Complaints state a cause of action for market manipulation under 10b-5(a) & (c); that the Plaintiffs have standing to sue; that the court has personal jurisdiction over the Zangara Defendants; that Plaintiffs are not required to dismiss this case and submit it to arbitration; and that venue is proper as to the Zangara Defendants, the court will DENY their motion to dismiss Counts One through Six on these grounds.  However, the court will GRANT their motion to dismiss Count One to the extent that it insufficiently alleges misrepresentations and omissions under 10b-5(b).

## C.  Motions to Dismiss by the BMF Defendants

In his motion to dismiss, Joseph Manfredonia "incorporates by reference the grounds asserted by the other so-called 'Scheme Defendants.'" (doc. 134).  Defendant BMF Consulting's motion to dismiss then echoes Joseph Manfredonia's**.** (doc. 138).  Accordingly, the court will consider these two motions together.  The court notes that neither Manfredonia nor BMF provided the court with additional facts unique to those Defendants that would affect its rulings on the following issues:  specificity standards of pleading, causation, standing, venue, arbitration, and personal jurisdiction.  According to the Second Amended Complaints, BMF is the only non-domestic Defendant; it is a Bahamas corporation.  However, the pleadings further state that BMF

36

was formed pursuant to the International Business Companies Act of 2000 and does business in the United States.  BMF's motion includes no arguments that it does not have minimum contacts with the United States and provides no specific facts supporting an argument that litigating in Birmingham would represent a constitutionally significant inconvenience.

The only new argument that these Defendants raise involves their reading of the Second Amended Complaints to allege that they "'aided and abetted' a securities fraud by a third party." (doc. 134 ¶ 8).  Plaintiffs assert that this argument is based upon a misreading of the amended complaints; those pleadings allege that the so-called "Scheme Defendants" – which term would include Manfredonia and BMF – were "possibly aided and abetted by others."  (doc. 86 ¶ 31). The court agrees with Plaintiffs; Plaintiffs do not seek to assert a claim for aiding and abetting against the "Scheme Defendants;" thus, the BMF Defendants' argument is moot on this point.

Having found that the Plaintiffs' Second Amended Complaints state a cause of action for market manipulation under 10b-5(a) & (c); that the Plaintiffs have standing to sue; that the court has personal jurisdiction over Manfredonia and BMF; that Plaintiffs are not required to dismiss this case and submit it to arbitration; and that venue is proper as to Manfredonia and BMF, the court will DENY their motions to dismiss Counts One through Six on these grounds.  However, the court will GRANT their motions to dismiss Count One to the extent that it alleges misrepresentations and omissions under 10b-5(b).

## CONCLUSION

In summary, the court will

- DENY the Birch Capital Defendants' motion to dismiss (doc. 107, as amended in doc. 130);

- DENY the Birch Capital Defendants' alternative motion for transfer of venue under 1404(a) (doc. 107, as amended in doc. 130);

- GRANT the motions to dismiss of the Zangara Defendants, Joseph Mandredonia, and BMF Consulting, Ltd. in this respect: Count One  will be dismissed without prejudice as to all Defendants, including Birch Capital and Marin, *only to the extent that it alleges misrepresentations and omissions under 10b-5(b)* (doc. 110, as amended in doc. 125; doc. 132, 134, 138);

- DENY the motions to dismiss of the Zangara Defendants, Joseph Mandredonia, and BMF Consulting, Ltd. regarding Counts One through Six on all other grounds (doc. 110, as amended in doc. 125; doc. 132, 134, 138).

Dated this 30th day of September, 2008.

KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE